# Supreme Court of Florida

_____

No. SC19-704
_____

**TINA LASONYA BROWN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC19-1419
_____

**TINA LASONYA BROWN,**
Petitioner,

vs.

**MARK S. INCH, etc.,**
Respondent.

August 27, 2020

PER CURIAM.

Tina Lasonya Brown appeals the circuit court's order denying her motion to vacate her conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal Procedure 3.851, and she also petitions this Court for a

writ of habeas corpus.  We have jurisdiction.  *See* art. V, § 3(b)(1), (9), Fla. Const.

For the reasons below, we affirm the circuit court's denial of postconviction relief

and deny Brown's habeas petition.

## I. BACKGROUND

The facts of this case, including the overwhelming evidence of Brown's

guilt, were set out in this Court's opinion on direct appeal.  *See Brown v. State*, 143

So. 3d 392, 395-402 (Fla. 2014).  There, we explained that the evidence presented

at trial established that Brown; her daughter, Britnee Miller; and her neighbor

Heather Lee lived in the same mobile home park as the victim, Audreanna

Zimmerman.  *Id.* at 395.  In March 2010, Miller and the victim had an altercation

during which Miller attempted to strike the victim and the victim defended herself

with a stun gun.  *Id.*  Thereafter,

> on March 24, 2010, Brown invited Zimmerman to her home under the
> guise of rekindling their friendship.  Before Zimmerman arrived,
> Brown, Miller, Lee, and Miller's thirteen-year-old friend, [M.A.,]
> were inside the trailer.  Brown and Lee were in the kitchen, where Lee
> instructed Brown on the proper use of a stun gun.  Miller then pulled
> her friend aside and told her, "[W]e're fixing to kill Audreanna
> [Zimmerman]."  Shortly after 9 p.m., Zimmerman entered the trailer.
> Brown waited several minutes and then used the stun gun on
> Zimmerman multiple times.  When Zimmerman lost muscular control
> and fell to the floor, Brown continued to use the stun gun on
> Zimmerman, who was screaming and crying for help.  Eventually,
> Brown pulled Zimmerman across the trailer into the bathroom.
> Zimmerman continued to scream and cry for help, so Miller struck
> Zimmerman in the face and Lee stuffed a sock into Zimmerman's
> mouth.  Zimmerman was then forcibly escorted outside and forced

into the trunk of Brown's vehicle.[n.2]  Brown, Miller, and Lee then entered the vehicle and drove away.

> [N.2]. During trial, Lee disputed this summation of what occurred in the trailer after Brown began to attack Zimmerman.  The veracity of Lee's testimony concerning her involvement in this crime, however, was significantly challenged during trial, particularly because Lee, who claimed that she was a victim and was not involved in Zimmerman's murder, *pled guilty* to second-degree murder based on her involvement in Zimmerman's death.

*Id.* at 395-96.

The record shows that when M.A. was asked at trial why she did not intervene as Zimmerman was being attacked at Brown's trailer, M.A. testified that she was afraid that "[i]f all three of them [were] going to do it, they could do the same thing to [her]."  M.A. further testified that Brown was the primary aggressor based on her observations at the trailer, although she said that Lee participated by putting a sock in the victim's mouth.  According to M.A.'s trial testimony, Brown used the stun gun on the victim, held the victim's hands behind her back, led the victim to Brown's car, and forced the victim into the trunk.  M.A. also testified that as Brown was attacking the victim with a stun gun, Brown screamed, "Did you call Crime Stoppers on me?"

Leaving M.A. behind at the trailer, Brown drove her car, with Miller and Lee inside and the victim in the trunk, "to a clearing in the woods about a mile and a half from the trailer park." *Brown*, 143 So. 3d at 396.  According to Lee's trial

- 3 -

testimony, the following events occurred once the women arrived at the clearing in

the woods:

> Brown exited the car and pulled Zimmerman out of the trunk.
> Zimmerman attempted to flee, but stumbled in the darkness and was
> caught by Brown and Miller. The two women wrestled Zimmerman
> to the ground and simultaneously attacked her. Brown used the stun
> gun again on Zimmerman as Miller beat her with a crowbar. Brown
> and Miller then switched weapons and continued to torture and beat
> Zimmerman. Miller eventually dropped the stun gun and repeatedly
> punched Zimmerman. Brown returned to the car, retrieved a can of
> gasoline from the trunk, and walked back toward the beaten and
> prone, but still conscious, Zimmerman. Brown poured gasoline on
> Zimmerman, retrieved a lighter from her pocket, set Zimmerman on
> fire, and stood nearby to watch the screaming Zimmerman burn. Lee
> testified that she was standing beside Miller, who exuberantly jumped
> up and down and screamed, "Burn, bitch! Burn!" After a few
> minutes, the three women returned to the car and drove away. During
> the ride home, Miller said, "Mom, you've got to turn around. I left
> my shoes and the taser." Brown, however, refused to return to the
> location of the event.

*Id.*

After Brown, Lee, and Miller left the scene of the burning, they returned to

Brown's trailer. *Id.* at 397. There,

> Brown and Miller removed their bloodstained clothing and placed it in
> a garbage bag. Lee removed her shoes, which were also stained with
> blood, and placed them in the bag. Miller informed her friend,
> [M.A.], who had remained at the trailer during the attack, that she had
> injured her hand striking Zimmerman, and that the three women had
> set Zimmerman on fire. Miller and [M.A.] then used Brown's car to
> drive to the hospital to get medical care for Miller.

*Id.*

- 4 -

Meanwhile, Zimmerman, who had not immediately succumbed to her wounds, walked about one-third of a mile to a neighboring home and asked for assistance. *Id.* at 396.

> At 9:24 p.m., an emergency medical technician (EMT) arrived at the scene. When the EMT approached Zimmerman, he observed her sitting on the porch, rocking back and forth with her arms straight out. Due to the extensive nature of Zimmerman's burns, the EMT testified that he could not initially identify whether she was wearing clothing. The EMT noticed that Zimmerman's skin was falling off her body, and he believed that over ninety percent of her body was burned. She had severe head trauma, and her jaw was either broken or severely dislocated. The EMT explained that the extent and severity of the burns prevented him from providing Zimmerman medical assistance. He testified that while he generally placed sterile gauze and oxygen on burns, he did not have enough gauze to cover her entire body. He attempted to stabilize her neck, but her skin was charred to such an extent that he could not touch Zimmerman without her skin rubbing off onto his gloves.
>
> Despite her injuries, Zimmerman was conscious and alert. She identified Brown and Lee as her attackers and told the EMT that she was "drug out of the house, tased, beaten in the head with a crowbar, and then set on fire." She also provided her address as well as the addresses of her attackers, and asked the EMT to protect her children. The ambulance arrived within a few minutes and transported Zimmerman to the hospital. Inside the ambulance, Zimmerman repeatedly asked if she was going to recover. She told the paramedic that Brown, Miller, and Lee poured gasoline on her and set her on fire. She also stated that she "thought they had made up." Zimmerman was stabilized at a local hospital and then transferred to the Burn Center at the University of South Alabama Hospital in Mobile, Alabama, where she died sixteen days later.

*Id.* at 396-97.

Based on the information provided by Zimmerman, Brown and Lee were arrested the night of attack, and Miller was arrested when she returned home from the hospital the next day. *Id.* at 397. However, all three were released while Zimmerman was still in the hospital. *Id.*

> During that time, Brown informed her friend Pamela Valley that she, Miller, and Lee had beaten Zimmerman, forced her into a car, driven her to an open field and "lit her on fire and didn't look back." A few days later, Brown informed Valley that Zimmerman was still alive and requested Valley to finish her off. Valley declined and later reported the conversation to law enforcement.

*Id.*

On April 9, 2010, the day that Zimmerman died as a result of multiple thermal injuries, Brown, Miller, and Lee were rearrested. *Id.* The State charged Brown with first-degree murder under both theories of premeditated and felony murder with kidnapping as the underlying felony.[1]

At trial, Brown's jury heard that, while Brown was awaiting trial in jail, she made statements to a fellow inmate, Corie Doyle, that were indicative of her state of mind following the altercation between her daughter and Zimmerman. *Id.* at 395 n.1. Specifically, Doyle testified at trial that Brown told her Zimmerman had used a stun gun on her daughter, Miller, and that when Brown had heard about it,

---

1. Brown was also indicted for kidnapping, but for reasons not explained in the record, the State entered a nolle prosequi as to the kidnapping charge as trial began.

she "informed Miller, '[D]on't worry, I'll take care of it.' " *Id.* Doyle also testified that she and Brown had a conversation early one morning during which Brown confessed her involvement in the murder. According to Doyle, at that time, Brown admitted that "they picked up the victim and beat her up and tazed her and set her on fire." When asked who "they" were, Doyle testified that it was "[Brown] and her daughter [Miller]" and that Heather Lee was there but that "she didn't have anything to do with it." When asked if she knew who Lee was at the time of this conversation, Doyle answered, "No. I have never laid eyes on her." Doyle further testified that she was eventually transferred and ended up housed with Lee.

In addition, Brown's jury heard that law enforcement had discovered physical evidence at the scene of the burning, "including a pair of white shoes; a stun gun with blood on the handle; paper stained with blood; an orange, gold, and black hairweave [that matched a large section missing from the back of Brown's hair]; a crowbar; and a pool of blood." *Id.* at 397 (footnote omitted). The jury also heard that blood discovered on the passenger seat headrest of Brown's vehicle matched Zimmerman's DNA profile, and that the blood on the stun gun matched Brown's DNA profile. *Id.*

Based on the evidence presented at trial, Brown's jury found her guilty of first-degree murder as charged. *See id.* at 397.

The case then proceeded to the penalty phase, where Brown presented evidence of mitigating circumstances through several family members and her mental health expert, Dr. Elaine Bailey. *Id.* at 397-400. Brown's penalty-phase presentation focused on how her traumatic background affected her and shaped her actions on the night of the murder. *See id.* This evidence included that Brown had suffered a deprived childhood; physical and sexual abuse, including being raped by her father and prostituted by her stepmother; parental and other familial abandonment; drug addiction; and exposure to her father's drug-related, violent criminal lifestyle as a child. *See id.* It also included evidence that, as an adult, Brown had experienced physically and sexually abusive relationships, including domestic abuse; and that she had struggled with addiction, particularly to crack cocaine, to the point that she lost custody of two of her children. *See id.* at 399.

Additionally, evidence regarding Lee's role in the crime factored into Brown's penalty-phase argument. For example, during the guilt phase, in addition to challenging Lee's denial of her role in the murder through cross-examination, trial counsel called Wendy Moye, a fellow inmate of Lee's, who testified that Lee admitted to her that she was the one who lit the victim on fire, that the group had gotten the victim into the car by telling her that they were going to the grocery store, and that the beating started in the car. Although Brown relied on this and other evidence to argue that Lee may have been more culpable and yet was

allowed to plead guilty to second-degree murder, the jury heard from Dr. Bailey

that "Brown did not deny her involvement in the murder, and that Brown felt

remorseful for her actions." *Id.* at 400.  More specifically, the penalty-phase

record reveals that Dr. Bailey testified that Brown had described Lee as "the

escalator" and further testified about "the impact of social mediation," telling the

jury that if they "believe[d] that [Lee] was more involved in [the crime]" than she

claimed, then "[t]here was social mediation going [o]n, social influence, and

group-mediated emotion" that "makes more extreme behavior."  However, Dr.

Bailey said that it was not her opinion that Brown "acted under extreme duress

under Heather Lee" and testified that Brown did "not deny being an aggressor,

being involved, . . . [or] what she did" and that Brown "was very frank about her

role" in the victim's murder during her evaluations.

The State's expert, Dr. John Bingham, also evaluated Brown and "found no

evidence that Brown lacked the capacity to conform her conduct to the

requirements of the law[] or that she exhibited diminished capacity in

understanding the criminality of her conduct." *Brown*, 143 So. 3d at 400.  He also

opined that Brown "was not under extreme duress or experiencing an emotional

disturbance at the time of the offense." *Id*.  Dr. Bingham testified that "there was

no indication" Brown's feelings of anger and rage "inhibited her ability to think

clearly or to recognize right from wrong," that "Brown's actions on the night of the

attack demonstrated preplanning, direction, and were goal[-]oriented," and that

"while there was substantial trauma in Brown's life, there was no cause and effect

relationship connecting Brown's past to her actions in murdering Zimmerman."

*Id.*

Following the penalty-phase presentation, the jury unanimously

recommended a sentence of death. *Id.* During the *Spencer*[2] hearing, records and

letters, including a letter from one of Brown's friends, were introduced into

evidence. *Id.* Brown "apologized to the victim's family," stated that the victim

"died a horrific death," admitted that she "was one of the ones who participated in

taking [the victim's] life," and said that the victim "didn't deserve it at all." *Id.*

Thereafter, the trial court followed the jury's recommendation and sentenced

Brown to death, finding that the aggravating circumstances outweighed the

mitigating circumstances. *Id.* at 400-02.

In so doing, the trial court found that the State had proven beyond a

reasonable doubt the existence of the following aggravating factors and assigned

them the noted weight: "(1) the murder was committed in a cold, calculated, and

premeditated manner without any pretense of moral or legal justification (CCP)

(great weight); (2) the murder was especially heinous, atrocious, or cruel (HAC)

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

(great weight); and (3) the murder was committed while Brown was engaged in the commission of a kidnapping (significant weight)." *Id.* at 401.

The trial court found one statutory mitigating circumstance, "that Brown had no significant history of prior criminal activity," and assigned it minimal weight. *Id.* The trial court considered but rejected the following four statutory mitigating circumstances: "(1) the crime was committed while Brown was experiencing an extreme emotional disturbance; (2) Brown was an accomplice in the crime and her participation was relatively minor; (3) Brown acted under extreme duress; and (4) the capacity of Brown to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was significantly impaired." *Id.* at 401 n.7.

The trial court also found twenty-seven nonstatutory mitigating circumstances and assigned them the noted weight:

> Specifically, the [trial] court found that Brown: (1) was the child of a teenage mother (minimal weight); (2) was neglected by both parents (some weight); (3) lost her childhood due to parental neglect (some weight); (4) was abandoned by her mother (some weight); (5) had a history of family violence (some weight); (6) was exposed to drugs during her adolescence (some weight); (7) suffered developmental damage due to her parents' use of and dependence on drugs (some weight); (8) was subjected to sexual violence inflicted by her father; (some weight); (9) was betrayed by a trusted family member (i.e., her grandmother) (some weight); (10) experienced corruptive community influences and exposure to a criminal lifestyle (some weight); (11) experienced chaotic moves and transitions (little weight); (12) was a victim of domestic violence during her adult life (some weight); (13) witnessed a violent homicide and served as a State witness in a murder trial (little weight); (14) lost her family (her parental rights were terminated for her two sons, and she has no relationship with her

- 11 -

mother or father) (little weight); (15) suffered repeated trauma throughout her life (little weight); (16) suffered from drug addiction (little weight); (17) suffered from the long term effects of chronic cocaine use on her brain (some weight); (18) was a productive citizen during periods of sobriety (little weight); (19) was living in poverty at the time of the crime (minimal weight); (20) behaved well in jail (little weight); (21) conducted a [B]ible study program (little weight); (22) exhibited good courtroom behavior (little weight); (23) has no possibility of parole (little weight); (24) showed remorse (some weight); (25) received a different sentence than that of her co-defendants (some weight)[n.8]; (26) had no history of prior criminal violence (moderate weight); and (27) was using cocaine on the day of the crime (moderate weight).

> [N.8] In finding th[e] mitigating circumstance [that Brown received a different sentence than that of her co-defendants], the trial court noted that:
>
> > the three people involved in the murder of Zimmerman are not similarly situated. Despite her involvement in Zimmerman's murder, Britnee Miller cannot legally be sentenced to death as she was less than 18 years of age when the murder was committed. Heather Lee was convicted, pursuant to a negotiated plea agreement with the State, of second[-]degree murder. Heather Lee cannot legally be sentenced to death.

(Citation omitted.)

*Id.* at 401 & n.8.

In sentencing Brown to death, the trial court "noted that this case, 'particularly because of the heinous, atrocious, [or] cruel nature of the murder of

- 12 -

Audreanna Zimmerman, falls into the class of murders for which the death penalty is reserved.' " *Id.* at 402.

On direct appeal, this Court affirmed Brown's conviction and sentence of death. *Id.* at 408.[3] Thereafter, the United States Supreme Court denied Brown's petition for a writ of certiorari. *Brown v. Florida*, 574 U.S. 1034 (2014).

In 2015, Brown filed an initial motion for postconviction relief, which was amended several times after being stricken for noncompliance with rule 3.851, and, in 2017, ultimately filed the third amended motion at issue in this appeal.[4] Following an evidentiary hearing, the circuit court denied relief on all of Brown's claims. Brown appeals the circuit court's denial of several of her claims, and she also petitions this Court for a writ of habeas corpus.

---

3. In her direct appeal, Brown raised the following claims: (1) the trial court erred in finding the CCP aggravating circumstance; (2) her death sentence was disproportionate; and (3) Florida's death penalty statute violates the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). *Brown*, 143 So. 3d at 402-08. Although Brown did not contest her guilt, this Court found the evidence sufficient to support her conviction. *Id.* at 407.

4. During this period, Brown filed three petitions in this Court: a petition seeking review of a nonfinal order denying Brown's motion to reconsider the order striking her initial postconviction motion (with leave to amend) for noncompliance with rule 3.851(e)(1), which this Court denied without prejudice, *Brown v. State*, No. SC16-358, 2016 WL 3474843, at *1 (Fla. June 24, 2016); and two petitions for writ of prohibition seeking to prohibit the trial judge from further participation in her case, both of which this Court denied, *Brown v. State*, No. SC16-397, 2016 WL 3459727, at *1 (Fla. June 24, 2016), and *Brown v. State*, No. SC17-2166, 2017 WL 6493249, at *1 (Fla. Dec. 19, 2017).

## II. POSTCONVICTION APPEAL

### A. Ineffective Assistance of Trial Counsel

Brown argues that trial counsel was ineffective in numerous respects during the jury selection, guilt, and penalty phases of her trial. Specifically, first, she argues that trial counsel was ineffective during jury selection for failing to strike juror Taylor for cause. Second, she claims that trial counsel was ineffective during the guilt phase (a) for failing to adequately challenge the State's evidence through cross-examination of witnesses Heather Lee and Corie Doyle and (b) for failing to present witnesses Darren Lee, Terrance Woods, and Nicole Henderson for purposes of impeachment. Third, she argues that trial counsel was ineffective during the penalty phase (a) for failing to conduct a reasonably competent mitigation investigation and present adequate mitigation and (b) for failing to consult and present additional mental health experts. Fourth, and last, she contends that the circuit court erred by denying her claim that, cumulatively, trial counsel's deficient performance during the guilt and penalty phases deprived her of a fundamentally fair trial.

To prevail on an ineffective assistance of counsel claim following the United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must satisfy two requirements:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably

competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

*Bolin v. State*, 41 So. 3d 151, 155 (Fla. 2010) (quoting *Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986)).

Regarding *Strickland*'s deficiency prong, there is a "strong presumption" that trial counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Regarding the prejudice prong, "*Strickland* requires defendants to show 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . [A] 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.' " *Henry v. State*, 948 So. 2d 609, 621 (Fla. 2006) (quoting *Strickland*, 466 U.S. at 694).

- 15 -

Because both prongs of *Strickland* present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence but reviewing the circuit court's legal conclusions de novo. *See Sochor v. State*, 883 So. 2d 766, 771-72 (Fla. 2004). "[W]hen a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong." *Zakrzewski v. State*, 866 So. 2d 688, 692 (Fla. 2003) (quoting *Waterhouse v. State*, 792 So. 2d 1176, 1182 (Fla. 2001)). "Where trial counsel is deficient in more than one area, however, we must 'consider the impact of these errors cumulatively to determine whether [the defendant] has established prejudice.' " *Sparre v. State*, 289 So. 3d 839, 847 (Fla. 2019) (quoting *Parker v. State*, 89 So. 3d 844, 867 (Fla. 2011)).

For the reasons below, we affirm the circuit court's denial of postconviction relief.

## (1) Jury Selection

Brown argues that trial counsel was ineffective for failing to strike juror Taylor for cause because juror Taylor's voir dire responses indicate that he would automatically vote for the death penalty if Brown was convicted of first-degree murder. We disagree.

To establish the prejudice required by *Strickland*, "where a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased." *Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007). "Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial—*i.e.*, that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." *Id.* Moreover, to establish actual bias, the record must show "something more than mere doubt about [the] juror's impartiality." *Mosley v. State*, 209 So. 3d 1248, 1265 (Fla. 2016).

When the record in this case is viewed as a whole, Brown cannot make the requisite showing of actual bias. Juror Taylor initially stated that he had an open mind as to the appropriate penalty. Subsequently, juror Taylor was asked if his response to defense counsel's question as to whether he could put aside his personal feelings, follow the judge's instructions, and consider the evidence before imposing the death penalty was "the same" as that of another prospective juror who had answered, "I could do that." Juror Taylor responded, "No," and then he explained his answer by stating that whether he would vote to impose the death penalty would "depend[] on the evidence" and that "[i]f it's proven without a shadow of a doubt, [he] would go with the death penalty."

Although that response arguably supports Brown's claim, the remainder of the record is to the contrary. For example, juror Taylor did not voice disagreement when trial counsel later asked the entire panel, "Do each of you agree that it's not automatic that [Brown] get the death penalty . . . if [Brown] would be found guilty of first-degree murder. . . . It's not automatic that she get the death penalty?" Similarly, juror Taylor did not voice disagreement with trial counsel's subsequent follow-up question to the entire panel as to whether there was anyone on the panel who would not be able to "consider the personal circumstances and background of the Defendant when you're making the decision as to whether to recommend life or death." Moreover, when trial counsel specifically questioned juror Taylor regarding his opinion of mental health professionals and the validity of the profession, juror Taylor was not dismissive of this type of mitigation and instead stated, "I would assume it's pretty valid."

On this record, at best, one of juror Taylor's voir dire responses raised some doubt as to his impartiality—doubt that is not enough to establish the requisite prejudice, *see Mosley*, 209 So. 3d at 1265, and that, in any event, is dispelled when the voir dire record is considered as a whole. Accordingly, because Brown cannot establish the actual bias required to prove that she was prejudiced by trial counsel's failure to challenge juror Taylor for cause, we affirm the circuit court's denial of relief. *See Carratelli*, 961 So. 2d at 324.

**(2) Guilt Phase**

Brown next argues that trial counsel was ineffective during the guilt phase (a) for failing to adequately challenge the State's evidence through cross-examination of witnesses Heather Lee and Corie Doyle and (b) for failing to present witnesses Terrance Woods, Darren Lee, and Nicole Henderson for purposes of impeachment.

**(A) Cross-Examination of Witnesses**

**Heather Lee**

Brown first argues that trial counsel's cross-examination of Heather Lee was ineffective because trial counsel failed to impeach Lee in several respects.

Prior Convictions

First, Brown argues that trial counsel was ineffective in cross-examining Lee because he failed to impeach Lee with her prior convictions for two petit thefts and two felony failures to appear. Brown argues that if Lee had opened the door when questioned as to the existence and number of her prior convictions, trial counsel could have inquired further into the details underlying those convictions and used that information to argue that the jury should not believe Lee's testimony and should instead believe that Lee was more culpable than Brown for the victim's murder due to Lee's violent history.

As an initial matter, the record refutes Brown's argument that impeaching Lee with her prior convictions would have opened the door to further inquiry about the underlying details of those convictions. Lee was questioned about her prior convictions at the evidentiary hearing, and postconviction counsel did not attempt to make such a record based on Lee's responses. Moreover, at best, Lee's responses would have resulted in the records of her convictions being introduced into evidence. *See Tilus v. State*, 121 So. 3d 1145, 1149 (Fla. 4th DCA 2013) ("The proper method to impeach a witness who provides inaccurate or misleading information regarding prior convictions is to admit certified copies of the convictions.").

Nevertheless, although Lee's prior convictions could not have been used to the extent Brown argues, they constitute available impeachment evidence that went unused by trial counsel. *See* § 90.610(1), Fla. Stat. (2019). However, we need not "delve into" whether Brown has made a showing as to the deficiency prong because there is no prejudice for the reasons explained below in our cumulative prejudice analysis. *Zakrzewski*, 866 So. 2d at 692.

Prior Inconsistent Statements

Second, Brown argues that trial counsel was ineffective in cross-examining Lee because he failed to impeach Lee with four alleged prior inconsistent statements. First, she argues that trial counsel should have impeached Lee's trial

- 20 -

testimony regarding her whereabouts on the day of the crime, namely that she went to Brown's trailer at approximately 9 p.m., with Lee's prior statements that she was around Brown's trailer between 3:15 and 3:45 p.m., but then went home to cook and visit with multiple family members.  Second, Brown argues that trial counsel should have impeached Lee's trial testimony about who was present in the vehicle used to transport the victim and in the area where the victim was lit on fire—herself, Miller, and Brown—with her prior statement that M.A. was also present and that M.A. and Miller held her at the back of the vehicle while Brown pulled the victim out of the trunk.  Third, Brown claims that trial counsel should have impeached Lee's trial testimony that she had not previously been to the area where the victim was lit on fire, but she could see the entrance to the area and the chains blocking it off, with her prior statement that she knew the area but it is usually blocked with strings to prevent people from entering.  Fourth, and finally, Brown argues that trial counsel should have impeached Lee's trial testimony that she "guess[ed]" her shoes were bloody because she stepped in some blood while running with her prior statement that she "guess[ed]" blood flew on her when the victim was being attacked, although she was not taking part in it.  Brown contends that trial counsel's deficient cross-examination prejudiced her because her jury did not hear additional evidence that it could have used to conclude that Lee was a liar.

However, Lee was not questioned at the postconviction evidentiary hearing about her alleged prior inconsistent statements on any of these subjects. Therefore, "what [she] would have said if questioned about [them] . . . is speculative and, thus, cannot support postconviction relief." *Calhoun v. State*, Nos. SC18-340 & SC18-1174, 2019 WL 6204937, at *9 (Fla. Nov. 21, 2019). Accordingly, we affirm the circuit court's denial of relief with respect to all of these claims.

Bias

Brown next argues that trial counsel was ineffective during her cross-examination of Lee by failing to impeach Lee through evidence of bias. *See* § 90.608(2). Specifically, Brown argues Lee's husband, Darren Lee, admitted during his pretrial deposition that he was sleeping with both the victim and Brown. She further argues that Terrance Woods testified during his pretrial deposition that Darren Lee was having an affair with the victim and that Heather Lee found out about it and got into a physical fight with the victim about it two days before the victim's murder. Brown argues that eliciting Lee's knowledge of her husband's affairs with both the victim and Brown during cross-examination would have established bias, namely Lee's motive to kill the victim and blame Brown. We affirm the denial of relief because Brown failed to present any evidence that would support this claim. Heather Lee denied knowledge of her husband's affairs when questioned about them at the postconviction evidentiary hearing. Trial counsel

- 22 -

cannot be ineffective for failing to elicit information from Lee on cross-examination that Lee denies exists. However, we recognize that in addition to challenging trial counsel's cross-examination of Heather Lee, Brown argues that trial counsel was ineffective for failing to call Darren Lee and Terrance Woods to impeach Lee about this and other subjects, and we address those claims below.

### Lee's Failure to Open the Door for Police

Brown further argues that trial counsel was ineffective in cross-examining Lee by failing to use Darren Lee's pretrial deposition testimony to discredit Lee's trial testimony that she did not open the door for the police because Brown told her not to. In his pretrial deposition, Darren Lee testified that no one opened the door because he was high. However, Brown cites no authority for her argument that trial counsel could have admitted Darren Lee's deposition testimony to impeach Heather Lee's trial testimony about why she did not open the door for police. To the extent Brown argues that trial counsel should have called Darren Lee as a witness to attack Lee's credibility by showing that the facts as to why Lee failed to open the door were not as Lee testified, *see* § 90.608(5), we address the argument that trial counsel was ineffective for failing to call Darren Lee as a witness to impeach Lee on this and other subjects below.

- 23 -

## Corie Doyle

Brown next argues that trial counsel was ineffective during his cross-examination of Corie Doyle because he failed to impeach Doyle with her prior convictions, jail records, and deposition statements.[5]  However, Brown's argument regarding Doyle's prior convictions was not included in her postconviction motion and is therefore procedurally barred.  *See Thompson v. State*, 759 So. 2d 650, 667 n.12 (Fla. 2000) (holding claim "procedurally barred because it was not alleged in the postconviction motion filed in the trial court").  Regarding the jail records, Brown claims that trial counsel could have used them to impeach Doyle's testimony that Brown confessed to her before she had ever seen Lee.  Brown explains that the records would show that Doyle was housed with Lee before she was housed with Brown and that this information undermines Doyle's claim never to have seen Lee before when this information is considered along with (a) Doyle's testimony that she approached Brown because Brown's jumpsuit was an eye-

---

5. Brown also argues that trial counsel was ineffective for failing to discover and use the testimony of another inmate, Nicole Henderson, that, in Henderson's observation, Brown was not an early riser.  She argues that Henderson's testimony would impeach Doyle's trial testimony that Brown confessed to her early one morning.  As explained below, Brown raises other ineffective assistance of counsel claims related to Henderson, which, like this claim, turn on whether trial counsel should have discovered the information available from Henderson prior to trial.  Therefore, we address all of Brown's ineffective assistance of counsel claims related to trial counsel's failure to call Henderson as a witness below.

catching color and (b) other evidence that Lee's jumpsuit was the same color as Brown's. Regarding Doyle's pretrial deposition, Brown claims that trial counsel failed to impeach Doyle with statements that would have shown Doyle learned about the murder from the news and embellished the details on her own, including Doyle's deposition testimony that Brown told her Miller caught herself on fire. However, because Doyle did not testify at the evidentiary hearing, "what [Doyle] would have said if questioned" about the jail records and statements made in her pretrial deposition "is speculative and, thus, cannot support postconviction relief." *Calhoun*, 2019 WL 6204937, at *9. Accordingly, we affirm the postconviction court's denials with respect to these claims.

## (B) Failure to Present Impeachment Witnesses

### Terrance Woods

Brown next argues that trial counsel was ineffective for failing to call Terrance Woods. Specifically, she argues that by calling Woods to impeach Heather Lee's trial testimony, trial counsel would have been able to lessen Brown's culpability, show that Heather Lee was the ringleader, and corroborate similar powerful impeachment evidence available from Darren Lee. We agree that trial counsel was deficient for failing to call Woods.

At his pretrial deposition, Woods testified that Heather Lee told him she had discovered that her husband, Darren Lee, was having an affair with the victim, and

that she had gotten into a fight with the victim about it two days prior to the murder. On the day of the fight, Woods heard Heather Lee say, "I'm going to kill the bitch." On a separate occasion, after the victim's murder, Woods stated that Heather Lee admitted to him and Darren Lee that "all three of them"—referring to herself, Brown, and Miller—"got the girl, we took her, we beat her up, set her on fire." Woods further stated that Lee admitted to pouring gas on the victim and to setting her on fire.

At the postconviction evidentiary hearing, Woods testified consistently with his deposition.[6] Although trial counsel generally testified that his strategy was to blame Heather Lee as much as possible without losing credibility with the jury by saying that Brown was not involved, trial counsel would not take a position as to whether calling Woods as a witness would have been helpful to Brown's case. When pressed, trial counsel stated, "Unless I didn't believe him," but he did not testify that he had actual knowledge that Woods was lying, or even that he actually did not believe Woods. Like many of the witnesses in this case, Woods was subject to impeachment with prior felony convictions, and the record shows that he was in prison at the time of Brown's trial and hoped to benefit from his testimony. However, because the record shows that Woods' testimony was consistent with

---

6. Prior to trial, Woods also wrote six letters to the State Attorney consistent with his pretrial deposition and evidentiary hearing testimony.

trial counsel's stated strategy, and when pressed on the issue, trial counsel could not articulate a reasonable strategy for failing to call Woods, we hold that trial counsel was deficient for failing to do so. *See Schoenwetter v. State*, 46 So. 3d 535, 554 (Fla. 2010) ("Reasonable decisions regarding trial strategy, made after deliberation by a claimant's trial attorneys in which available alternatives have been considered and rejected, do not constitute deficient performance under *Strickland.*").

Because, as explained below, we find trial counsel deficient in an additional respect, we address prejudice cumulatively.

**Darren Lee**

Brown next argues that trial counsel was ineffective for failing to call Darren Lee. Specifically, Brown argues that, after Terrance Woods testified at his pretrial deposition about incriminating statements Heather Lee made to himself and Darren Lee before and after the murder, no reasonable trial counsel would have failed to re-depose Darren Lee and call him as a witness at trial to impeach Heather Lee. Brown also argues that Darren Lee could have impeached Heather Lee's testimony as to why she did not open the door for the police, further discrediting Lee's attempts to paint Brown as the ringleader. We agree that trial counsel was deficient for failing to call Darren Lee.

Trial counsel testified at the postconviction evidentiary hearing that he could not see Darren Lee providing any useful information. However, when Darren Lee testified at the evidentiary hearing, he admitted to having affairs with both Brown and the victim, and he also testified to the statements that Heather Lee made to him in the presence of Terrance Woods. Darren Lee's testimony was consistent with that of Terrance Woods. Specifically, Darren Lee testified that before the victim's murder, after Heather Lee came home following a fight with the victim, she told him that he "won't be sleeping with that bitch." After the victim's murder, according to Darren's testimony, Heather Lee described how the victim begged for her life and claimed to have been the one who poured gas on the victim and lit her on fire. Finally, although Heather Lee testified during trial that she did not open the door for police following the victim's murder because Brown told her not to, during his pretrial deposition, Darren Lee stated that no one opened the door for the police because he was high.

Trial counsel testified at the postconviction evidentiary hearing that he did not think it would have been helpful to Brown's case or to the impeachment of Heather Lee to have Darren Lee testify, as Darren Lee had spoken to the police three times and never told them that Heather Lee confessed. Generally, "counsel is not ineffective for deciding not to call a witness whose testimony will be harmful to the defendant." *Diaz v. State*, 132 So. 3d 93, 109 (Fla. 2013).

However, we fail to see—and the record is silent regarding—how calling Darren Lee to testify at trial would have been inconsistent with trial counsel's stated strategy to place as much blame on Heather Lee as possible without having the jury think he was trying to "scam" them by saying that Brown was not involved in the victim's murder. To the contrary, as Brown argues, Darren Lee's testimony about Heather Lee's statements would have impeached her trial testimony that she and the victim were "real close friends" and other testimony in which she attempted to minimize her role in the victim's murder and described Brown as the ringleader. Further, Darren Lee's admissions to having affairs with both Brown and the victim could have been used to explain Heather Lee's motive for participating in the murder and her bias for testifying and attempting to minimize her role in comparison to Brown's. Moreover, most of the available impeachment testimony from Darren Lee would have been corroborated by the available impeachment testimony from Terrance Woods, which we have already held that trial counsel was deficient for failing to present. *Cf. State v. Morrison*, 236 So. 3d 204, 220 (Fla. 2017) (ruling that there were sufficient facts to place trial counsel "on notice" that further investigation of the defendant's mental health and social background was required and that counsel's failure to investigate such defenses were "not reasonable under prevailing professional norms"). We similarly hold that trial counsel was deficient for failing to call Darren Lee, and in light of our

holding that trial counsel was also deficient for failing to call Terrance Woods, we address prejudice cumulatively below.

## Nicole Henderson

In her last claim regarding trial counsel's guilt-phase representation, Brown argues that trial counsel was ineffective for failing to investigate and call Lee's fellow inmate Nicole Henderson as a witness at trial. At the postconviction evidentiary hearing, Henderson testified that while she was in jail with Lee, she overheard Lee talking to a third inmate about the victim's murder. According to Henderson, Lee told the other inmate that the murder happened because Lee's boyfriend had impregnated another lady and that Lee planned to "get off" by blaming the murder on Brown and Miller with the help of two juveniles who were being housed with Miller. On cross-examination, Henderson testified that it sounded like Lee was bragging and that Lee had not said how she planned to contact the two juveniles. Henderson also testified that Lee had gotten into a fight with Henderson's sister because Lee's boyfriend wanted to have sex with her. Finally, Henderson testified to her observations of Brown in jail, including that she did not see Brown awake or out of her cell early in the mornings.

Brown argues that trial counsel was ineffective for failing to discover and use Henderson's testimony about the conversation Henderson overheard to impeach Lee, for failing to use Henderson's testimony regarding the fight as

reverse *Williams*[7] rule evidence, and for failing to use Henderson's observations of Brown while they were in jail together to refute Corie Doyle's trial testimony that Brown confessed to her early one morning. We affirm the circuit court's denial of relief.

As an initial matter, Brown failed to establish a fact critical to all three of her arguments, namely that trial counsel should have discovered the information available from Henderson before trial. To the contrary, at the postconviction evidentiary hearing, trial counsel denied having knowledge that Lee had confessed to any inmate while in jail, except Wendy Moye. Also, Henderson testified at the evidentiary hearing that she did not tell anyone about Lee's confession when it occurred, and Henderson was not asked whether she told anyone about Lee's fight with her sister or about her observations of Brown.

However, even assuming that trial counsel should have discovered this information from Henderson, trial counsel testified at the evidentiary hearing that he generally does not like to use "jailhouse snitches and rats" because "[t]hey lie" and that he did not feel that having multiple witnesses testify that Lee had confessed would have been helpful for Brown's case. In light of the testimony about Lee's confession that the jury heard through Moye, the judgment call

---

7. *Williams v. State*, 110 So. 2d 654 (Fla. 1959); *see also State v. Savino*, 567 So. 2d 892, 894 (Fla. 1990).

- 31 -

associated with presenting any witness, particularly one who is incarcerated, and trial counsel's strategy not to present testimony from multiple witnesses on the same topic, we cannot say that the record is devoid of competent, substantial evidence supporting the circuit court's finding that trial counsel was not deficient for failing to call Henderson to testify regarding Lee's statements to her. *Cf. Whitfield v. State*, 923 So. 2d 375, 380 (Fla. 2005) (explaining that "trial counsel have significant leeway in determining how to present [cumulative] evidence," in the context of addressing the claim that trial counsel was ineffective for failing to call additional witnesses to corroborate the defendant's voluntary intoxication defense).

Moreover, Henderson's testimony that Lee had gotten into a fight with Henderson's sister because Lee's boyfriend wanted to have sex with Henderson's sister would not have been admissible as reverse *Williams* rule evidence, even assuming that Brown preserved this argument, which she did not.[8] The circumstances of Lee's fight with Henderson's sister are not sufficiently similar to the circumstances of the victim's murder to constitute reverse *Williams* rule evidence. *See State v. Savino*, 567 So. 2d 892, 894 (Fla. 1990) (explaining that under the reverse *Williams* rule, a defendant may introduce evidence that another

8. This argument is not preserved because Brown raised it for the first time in her initial brief. *See Thompson*, 759 So. 2d at 667 n.12. Below, Brown claimed the same evidence showed Lee's reputation for violence.

person has committed a similar crime if the evidence shows "a close similarity of facts, a unique or 'fingerprint' type of information").

Finally, competent, substantial evidence supports the circuit court's finding that trial counsel was not deficient for failing to present Henderson's testimony about her observations of Brown because it did not refute Doyle's trial testimony that Brown confessed to her early one morning. Although, at the postconviction evidentiary hearing, Henderson testified that based on her observations of Brown while they were in jail together, Brown was not an early riser, Henderson admitted on cross-examination that it was possible Brown got up early at times.

Accordingly, we affirm the circuit court's denial.

### (3) Penalty Phase

In her final claim of ineffective assistance of trial counsel, Brown argues that trial counsel was ineffective during the penalty phase in two respects, namely (a) for failing to conduct a reasonably competent investigation and present adequate mitigation and (b) for failing to consult and present additional mental health experts.

### (A) Mitigation

Brown first argues that trial counsel rendered deficient performance in investigating and presenting mitigation. After providing the necessary background about Brown's postconviction motion and the circuit court's rulings, we explain

- 33 -

the procedural bar that applies to Brown's appeal of the denial of this claim and why, even without the procedural bar, we would nevertheless affirm.

Following the postconviction evidentiary hearing, the circuit court ruled that portions of Brown's claim were facially insufficient. Specifically, the circuit court found that the "blanket and non-detailed allegation" that trial counsel "failed to speak with any of [Brown's] cousins, friends, ex-boyfriends, or ex-husbands" was "facially insufficient" and denied it "with prejudice," "to the extent [it] can be considered a subclaim." In so ruling, the circuit court explained that Brown's motion "fails to identify with particularity the identity of these purported witnesses, the content of their testimony, if [Brown] told counsel about these people, if they were available to testify, and most importantly, how their testimony would have made a difference in [Brown's] sentence."

Similarly, Brown's motion alleged that trial counsel failed to fully explain Brown's background "including but not limited to: her extensive history of drug abuse, her extensive history of physical and sexual abuse, her mental illness, her family's background, and *how that background affected Ms. Brown and her conduct during the commission of the crime*." However, without attributing any of the information to a specific source, Brown's motion devoted approximately four-and-a-half pages to discussing the "wealth of mitigation" that she claimed would have been available had trial counsel "properly prepared and investigated." In

finding that this portion of Brown's claim was also "facially insufficient," the circuit court ruled that Brown "goes on for pages, giving details of [her] life, but she does not link this information to any particular witness or indicate through which witnesses penalty-phase counsel should have presented this information" and further "does not explain specifically how any of this information would have made a difference in [her] trial." The circuit court also gave two other reasons for denying this portion of Brown's claim. First, the circuit court alternatively ruled that even if this portion of Brown's claim were facially sufficient, "the information alleged is cumulative to the lengthy mitigation already presented by penalty-phase counsel." Second, the circuit court ruled that Brown "failed to demonstrate how penalty-phase counsel did not 'link' [Brown's] background to its effect on [Brown] during the crime," crediting trial counsel's evidentiary hearing testimony that she "thought" that Brown's mental health expert, Dr. Elaine Bailey, "covered [Brown's] life history from the beginning to the time of the crime, and linked [Brown's] life history to the crime itself," and finding that the record "supports this conclusion."[9]

_____

9. Indeed, it does. For example, Dr. Bailey testified during the penalty phase to the "stressors" that would have affected Brown at the time of the crime, including "repeated traumas, addictions, abusive relationships, exposure to violence, a lot of sexual victimization, both in childhood being prostituted and adulthood[,] [and a] lot of community negative influence and crime, and [she explained that] all of those things c[a]me together." Dr. Bailey also testified that Brown's childhood experiences would have affected her into adulthood, that

- 35 -

In addition to the above rulings, the circuit court ruled that Brown failed to substantiate the remaining portions of her claim that related to named individuals. Specifically, Brown's motion named three family members she claimed trial counsel was ineffective for failing to adequately investigate and prepare for the penalty phase: (1) her mother Lily Ramos; (2) her brother Willie Coleman, Jr.; and (3) her paternal uncle Gerald Coleman. The circuit court denied relief, finding that Brown "failed to present any evidence to support her allegations that the witnesses were ill-prepared." In so ruling, the circuit court cited trial counsel's explanation at the evidentiary hearing regarding why Brown's mother was not called as a penalty-phase witness, which included that Brown's mother "actually told [trial counsel] she believed [Brown] should get the death penalty." With respect to Willie Coleman, Jr., and Gerald Coleman, the circuit court found that although the documentary evidence showed defense counsel's trip to visit Brown's family occurred weeks before the trial, Brown "failed to present any testimonial evidence to show that penalty-phase counsel did not adequately prepare the witnesses who testified."

Brown's motion also identified three other individuals she claimed trial counsel was ineffective for failing to discover and present as penalty-phase

---

trauma affects brain development, and that "[t]he bottom line is trauma is cumulative."

witnesses: (1) her cousin Trina Bell; (2) one of her ex-husbands and the father of her three children, Gregory Miller, Sr.; and (3) her friend Jennifer Malone. Brown's motion alleged that Bell "could have provided evidence of [her] history of sexual abuse, drug use, and physical abuse by her boyfriends," that Miller "had firsthand knowledge of [her] daily cocaine and heroin use, physical abuse from her father, and episodes of domestic violence," and that Malone had sent a letter to the trial judge and had offered to be of assistance but that trial counsel failed to follow up. None of these individuals testified at the postconviction evidentiary hearing. Just as it ruled regarding the other named individuals, the circuit court ruled that Brown failed to substantiate these claims (in addition to providing alternate bases for denying relief with respect to Miller and Malone).

More specifically, regarding Bell, the circuit court denied relief because, despite being granted an evidentiary hearing on this claim, Brown "failed to present Ms. Bell's testimony or any evidence to substantiate her allegations regarding Trina Bell."

Regarding both Miller and Malone, the circuit court ruled that their failures to testify at the evidentiary hearing precluded it from assessing their credibility and determining whether their testimony would have made a difference in Brown's sentence. Alternatively, the circuit court ruled that even if they had testified consistently with what Brown's postconviction expert, Dr. Faye Sultan, testified at

the evidentiary hearing that they had told her, the information was cumulative to that presented during the penalty phase.[10]

Brown now appeals the circuit court's denial, arguing that "the evidence presented at the evidentiary hearing was far from cumulative." As explained above, the circuit court found that the entirety of Brown's claim was either facially insufficient or unsubstantiated, and Brown fails to challenge those rulings on appeal. Instead, she challenges only the circuit court's alternative ruling that even if her claim were facially sufficient, the mitigation alleged in her postconviction motion was cumulative to the mitigation already presented at the penalty phase. In failing to challenge the circuit court's primary bases for denying relief, Brown has waived the argument that they are in error. *See Shelly v. State*, No. SC16-1195, 2019 WL 102481, at *1 (Fla. Jan. 4, 2019) ("[A]n argument not raised in an initial

_____

10. In its alternative ruling about the cumulative nature of the mitigation, the circuit court identified one exception regarding Malone. Specifically, the judge who presided over Brown's trial received an email from Jennifer Malone on the morning of the *Spencer* hearing that stated Brown "did A LOT for [Malone] when [she] had no one else" and that "the Tina [Malone] knew was a wonderful friend and person that would do anything to help anyone." Although the circuit court ruled that Dr. Sultan's testimony about her interview with Malone revealed "additional details regarding [Brown's] influence in Ms. Malone's life," it found that the information "would not have changed [Brown's] sentence." Moreover, the circuit court ruled that Brown provided no evidence to support her claim that penalty phase counsel should have known of Malone's existence in time to present her testimony to the penalty phase jury, and that "[c]ounsel cannot be found deficient for failing to investigate a person she did not know existed."

brief is waived.") (quoting *Tillery v. Fla. Dep't of Juvenile Justice*, 104 So. 3d 1253, 1255 (Fla. 1st DCA 2013)).

But, even if she had not, we would still affirm. The circuit court correctly ruled that the portions of Brown's motion that failed to identify the witnesses trial counsel was supposedly deficient for failing to discover, the specific mitigation each would have provided, or how its absence prejudiced her are facially insufficient. *See State v. Lucas*, 183 So. 3d 1027, 1032 (Fla. 2016) ("There is no question that when the ineffective assistance claim alleges trial counsel should have presented a *fact* witness, such witness must be named and his or her availability attested to."); *see also Booker v. State*, 969 So. 2d 186, 196 (Fla. 2007) ("To establish a claim of ineffective assistance of trial counsel for failing to call certain witnesses, a defendant must allege in the motion 'what testimony defense counsel could have elicited from [the] witnesses and how defense counsel's failure to call, interview, or present the witnesses who would have so testified prejudiced the case.' " (quoting *Nelson v. State*, 875 So. 2d 579, 583 (Fla. 2004))).[11]

---

11. We note that Brown's noncompliance with rule 3.851 was a recurring theme below that delayed this case for years. Brown amended her postconviction motion multiple times after the circuit court struck the prior version for failing to comply with rule 3.851. The order on appeal constitutes the denial of Brown's third amended motion. Even still, the circuit court's order notes the "disorganized" nature of the motion and finds that "to the extent that this court may have failed to address any claims, this Court considers those claims, subclaims, and/or arguments waived based on [Brown's] failure to comply with the pleading requirements of rule 3.851." Brown does not appeal this ruling.

Regarding the remaining portions of Brown's claim related to the six named individuals, because the record supports the circuit court's finding that Brown failed to substantiate those portions of her claim, we would affirm.

Moreover, although as explained above, the procedural bar and affirmance on the alternate bases of facial insufficiency and failure to substantiate make it unnecessary to address the circuit court's alternative ruling regarding the cumulative nature of the mitigation, we agree with the circuit court's conclusion.[12]

_____

12. Brown's focus in the penalty phase was on how her traumatic background affected her and shaped her actions on the night of the murder. The background information presented at the penalty phase included Brown's (1) suffering physical and sexual abuse (namely being raped by her father and prostituted by her stepmother), parental and other familial abandonment, drug addiction, and exposure to her father's drug-related, violent criminal lifestyle as a child and (2) experiencing domestic abuse and struggles with addiction as an adult, to the point that she lost custody of two of her children. Along with presenting this evidence, Brown argued that Heather Lee may have been more culpable and yet was allowed to plead guilty to second-degree murder. Indeed, of the twenty-seven nonstatutory mitigating circumstances found by the trial court, nineteen relate to Brown's traumatic experiences and struggles with addiction. *See Brown*, 143 So. 3d at 401 (nonstatutory mitigating circumstances 1-17, 19, and 27).

Similarly, Brown's postconviction motion describes her deprived childhood; her struggles with drug addiction that began in childhood, particularly to crack cocaine; and her traumatic experiences, including that her childhood home was filled with violence and used in a drug operation, that she was neglected and emotionally, physically, and sexually abused (including being raped by her father and prostituted for drugs and money by her stepmother with her father's approval) as a child, and that she was abused by ex-husbands and ex-boyfriends as an adult. Although Brown's initial brief improperly references additional mitigation that was not included in her postconviction motion and that was obtained from sources who were not identified in her motion and who did not testify at the evidentiary hearing,

Accordingly, we affirm the circuit court's denial of relief.

## (B) Mental Health Experts

Brown next argues that the circuit court erred in denying her claim that trial counsel was ineffective during the penalty phase for failing to consult and present additional mental health experts to explain the combined effects of polysubstance abuse, childhood trauma, and mental illness on her brain. The circuit court ruled that trial counsel was not deficient for failing to hire additional mental health experts based on trial counsel's testimony at the evidentiary hearing that Brown's penalty-phase mental health expert, Dr. Bailey, did not recommend doing so. Brown argues that "regardless of the court's finding that trial counsel was not deficient for relying upon Dr. Bailey, trial counsel was . . . deficient for failing to recognize the[] red flags" of Brown's longtime struggles with drug addiction and her lifelong traumas. She contends that these red flags would have led reasonable trial counsel to investigate further and to retain and present the testimony of an addiction specialist and a neuropsychologist. We affirm because competent, substantial evidence supports the circuit court's finding that trial counsel was not deficient.

---

even that mitigation falls within the scope of trial counsel's penalty phase presentation.

This Court has long held that "defense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire." *Darling v. State*, 966 So. 2d 366, 377 (Fla. 2007) (finding no deficiency where "[t]he testimony presented during the postconviction evidentiary hearing may generally be described as only a more detailed presentation of the mitigation that was actually presented during the penalty phase").

Although Brown argues her case is similar to *Ellerbee v. State*, 232 So. 3d 909 (Fla. 2017), where this Court held that trial counsel was ineffective in the presentation of mental health mitigation, it is not. In *Ellerbee*, the penalty-phase jury heard "conflicting evidence and unsubstantiated claims that [the defendant] suffered from various mental disorders," *id.* at 928, and the penalty-phase mental health expert "did not provide a detailed explanation of the effect that abuse and drug use can have on cognitive development." *Id.* at 931. Instead, pursuant to trial counsel's direction, Ellerbee's penalty-phase mental health expert "focus[ed] on fetal alcohol syndrome while simultaneously presenting testimony directly contradicting its existence." *Id.* Unlike *Ellerbee*, where the "contradictory evidence would have confused the jury at best and, at worst, raised suspicions of defense counsel's honesty," *id.* at 932, the theme of Brown's penalty phase was that her lifelong traumatic experiences (including childhood physical and sexual

abuse) and her longtime struggles with addiction (including multiple relapses and use of crack on the day of the crime) affected her up through the time of the crime.

Indeed, as explained above, the circuit court denied Brown's separate claim that trial counsel was ineffective with respect to the mitigation investigation and presentation, in part, because Brown "failed to demonstrate how penalty-phase counsel did not 'link' [Brown's] background to its effect on [her] during the crime." In so ruling, the circuit court found that the record supports trial counsel's testimony at the evidentiary hearing that "she thought [the defense expert] Dr. Bailey covered [Brown's] life history from the beginning to the time of the crime, and linked [Brown's] life history to the crime itself." Competent, substantial evidence supports the circuit court's findings. For example, Dr. Bailey testified during the penalty phase to the "stressors" that would have affected Brown at the time of the crime, including "repeated traumas, addictions, abusive relationships, exposure to violence, a lot of sexual victimization, both in childhood being prostituted and adulthood[,] [and a] lot of community negative influence and crime, and [she explained that] all of those things c[a]me together." Dr. Bailey also testified that Brown's childhood experiences would have affected her into adulthood, that trauma affects brain development, and that "[t]he bottom line is trauma is cumulative." Moreover, as demonstrated in this Court's decision in Brown's direct appeal, trial counsel's penalty-phase presentation resulted in the

trial court's finding of numerous mitigating circumstances related to Brown's traumatic experiences and struggles with addiction, including the long-term effects of chronic cocaine use on her brain and that she was using cocaine on the day of the crime. *See Brown*, 143 So. 3d at 401.

That new experts retained for postconviction would render more favorable opinions based on essentially the same information presented during the penalty phase does not render trial counsel deficient for relying on the opinions of Dr. Bailey. *See Darling*, 966 So. 2d at 377.

Accordingly, we affirm the circuit court's denial.

## (4) Cumulative Prejudice

Brown next argues that the circuit court erred in denying her cumulative error claim because, cumulatively, trial counsel's deficient performance in the guilt and penalty phases deprived her of a fundamentally fair trial. As explained above, we conclude that the available impeachment evidence of Heather Lee's prior convictions went unused by trial counsel, and we agree with Brown that trial counsel was deficient for failing to present Terrance Woods and Darren Lee to impeach Heather Lee's trial testimony and implicate her as the ringleader. Assuming counsel was deficient for failing to impeach Lee with her prior convictions and taking into account counsel's deficiencies in failing to call Woods and Darren Lee as witnesses, we must "consider the impact of these errors

cumulatively to determine whether [the defendant] has established prejudice." *Sparre*, 289 So. 3d at 847 (quoting *Parker*, 89 So. 3d at 867).

They do not. All of trial counsel's deficiencies center around the failure to discredit Lee and her version of events. The likelihood that the jury placed high value on Lee's testimony is suspect, at best, because the jury knew that, despite describing herself as a victim and minimizing her role in the victim's murder, Lee had pleaded guilty to the victim's second-degree murder in exchange for testifying against Brown. Nevertheless, it is true that but for trial counsel's deficiencies, the jury could have relied on Heather Lee's prior convictions and testimony from Terrance Woods and Darren Lee to further discount Lee's testimony and conclude that her role in the crime was more substantial than she admitted during the guilt phase. However, there is no reasonable probability that but for trial counsel's deficiencies, individually or cumulatively, the outcome would have been different.

Regarding the guilt phase, the evidence of Brown's involvement and culpability in the victim's murder under both theories of premeditated and felony murder is overwhelming. For example, the victim named "Tina [Brown], Heather [Lee], and Britnee [Miller]" as her attackers and told a paramedic that "they poured gas on her and set her on fire." Although the paramedic acknowledged on cross-examination by trial counsel that the victim "didn't actually breakdown what each one of these people did to her," the victim's statement that "they" did it, at a

minimum, indicates that in her experience her attackers were acting in concert. Moreover, M.A. testified that Brown was the primary aggressor based on her observations at the trailer where the attack began. According to M.A., Brown attacked the victim with a stun gun, held the victim's hands behind her back, forced the victim into the trunk, and screamed at the victim about calling Crime Stoppers. Consistent with M.A.'s testimony, Brown's DNA was on the stun gun, Brown's trailer and vehicle were used in the crime, and Brown drove the victim to the area where she was lit on fire. Additionally, both Brown and her daughter, Miller, made incriminating statements: Miller told M.A. that they were going to kill the victim right before the attack began, and, within days of the crime, while the victim was still alive in the hospital, Brown told Pamela Valley that she wanted the victim "finish[ed] off." Accordingly, there is no reasonable probability of a different verdict.

Regarding the penalty phase, impeaching Lee with her prior convictions and calling Terrance Woods and Darren Lee to impeach Lee's testimony and implicate her as the ringleader during the guilt phase would not eliminate the overwhelming evidence of Brown's involvement and culpability in the victim's murder from the sources other than Lee, such as those discussed above. Moreover, during the penalty phase, the jury heard even more evidence negating that Brown's role in the crime was minor, including testimony from Brown's own mental health expert

that, despite describing Heather Lee as "the escalator," Brown "was very frank about her role" in the victim's murder, and "[did] not deny being an aggressor, being involved, . . . [or] what she did." Nor would counsel's deficiencies with respect to Lee change the application of the weighty evidence in aggravation to Brown. Accordingly, there is no reasonable probability of a different sentence.

Because Brown has failed to show that trial counsel's deficiencies, individually or cumulatively, establish the prejudice required by *Strickland*, we affirm the circuit court's denials of relief with respect to each of the individual claims at issue and with respect to Brown's cumulative error claim.

## B. Newly Discovered Evidence

Brown next argues that the circuit court erred in denying her claim of newly discovered evidence related to Heather Lee's credibility as a witness and Lee's role in the murder. Specifically, Brown points to an email from Lee's trial attorney, which was disclosed to Brown's counsel without authorization; posttrial confessions by Lee to fellow inmates; and evidence of Lee's pattern of violence against individuals, like the victim, who engaged in affairs with her significant others. Brown argues that she is entitled to a new trial because this evidence would probably result in her acquittal or a reduced sentence. However, as explained below, portions of Brown's claim involve evidence that is inadmissible and allegations that are procedurally barred. Although portions of Brown's

allegations do involve newly discovered evidence, it is not of such a nature that it would probably produce an acquittal on retrial. Accordingly, we affirm the circuit court's denial of relief.

### (1) The email from Heather Lee's attorney is inadmissible.

Brown argues that the circuit court erred in ruling inadmissible an email from Heather Lee's trial attorney to Lee's mitigation specialist. We disagree.

Below, Lee's trial attorney joined a motion filed by the State to exclude the email under section 90.502(2), Florida Statutes (2019). Section 90.502(2) provides that "[a] client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client." This privilege may be asserted by a lawyer on behalf of the client. § 90.502(3)(e).

The circuit court found that section 90.502(2) applies to require exclusion of the email, further finding that the attorney-client privilege had not been waived and noting that Brown had presented no evidence that Lee sought or obtained her attorney's services to enable her to commit a crime or fraud so as to establish an exception to this rule under section 90.502(4)(a). Indeed, Brown has not identified any such evidence or identified any other authority that would nevertheless allow

- 48 -

the email to be admitted.  Consequently, she has failed to show error in the circuit court's ruling.

Although Brown asks us to disregard section 90.502(2) in the interests of due process and justice, her general arguments to this effect—unsupported by any case law addressing similar or analogous circumstances—are insufficient to overcome this well-established evidentiary rule, adopted in the broader interests of justice and in furtherance of the crucial relationship of client and counsel.  *See Horning-Keating v. State*, 777 So. 2d 438, 445 (Fla. 5th DCA 2001) ("[One of t]he oldest and most revered principles of Anglo[-]American law is the attorney-client privilege . . . .  The purpose of the privilege is to encourage broad communication between a lawyer and the client and thus promote the broader public interest in the proper administration of justice." (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)); *see also R.L.R. v. State*, 116 So. 3d 570, 573 n.3 (Fla. 3d DCA 2013) (noting that the attorney-client privilege "is an interest traditionally deemed worthy of maximum legal protection").  Even if Brown could overcome this evidentiary rule, the email is inadmissible for an additional reason, which was raised by the

state below and has not been addressed by Brown on appeal: the email is inadmissible hearsay.  *See* §§ 90.801-.802, Fla. Stat. (2019).[13]

Accordingly, we affirm the circuit court's order excluding the email.

## (2) The circuit court properly refused to consider Tajiri Jabali's testimony as newly discovered evidence.

Brown relies on testimony provided by Tajiri Jabali at the postconviction evidentiary hearing as newly discovered evidence of (1) Heather Lee's motive for and role in the victim's murder and (2) Heather Lee's pattern of violent conduct against those with whom Lee's significant others "cheat."  However, the circuit court refused to consider Jabali's testimony as newly discovered evidence on the ground that "there is no claim regarding Tajiri Jabali alleged in [Brown's] motion." Because Brown waited until her reply brief to challenge the circuit court's ruling on this issue, Brown has waived any challenge to it.  *See Hoskins v. State*, 75 So. 3d 250, 257 (Fla. 2011).

Moreover, even without the waiver, we would still affirm on the record before us.  By its plain language, rule 3.851(e)(1) provides that "[e]ach claim or subclaim *shall* be separately pled" in the initial postconviction motion.  (Emphasis added).  A defendant cannot plead a claim of newly discovered evidence without

---

13.  An appellate court may affirm a correct result reached by a lower court for any reason that is supported by the record, even if it is not the reason the lower court articulated for its ruling.  *Robertson v. State*, 829 So. 2d 901, 906 (Fla. 2002).

alleging that the specific evidence at issue could not have been discovered at trial with due diligence and that the specific evidence at issue is of such a nature that it would probably produce an acquittal on retrial. *See Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998). Brown's motion did not plead a claim of newly discovered evidence regarding Jabali, and there was no argument raised below as to why the circuit court should have nevertheless considered Jabali's testimony newly discovered evidence. Accordingly, we would not reverse the circuit court's ruling on this issue, even if it were properly before us.

**(3) The evidence properly before the Court does not warrant relief.**

The evidence properly before the Court as alleged newly discovered evidence is the following: (1) Jessica Swindle's testimony that, while in prison, Heather Lee told her, without remorse, that she personally set the victim on fire because the victim was sleeping with her "baby's dad" and that Brown and Miller "didn't do anything"; (2) Shayla Edmonson's testimony that, while in prison, Heather Lee told her that she "killed someone and she would do it again because the people that were involved in the case . . . were sleeping with her husband . . . and she set the girl on fire"; and (3) Nicole Henderson's testimony that Heather Lee would fight the women her prison girlfriend cheated on her with. When subjected to cross-examination, Swindle and Edmonson agreed that it seemed like Lee was trying to be tough.

As we explained in *Jones*, 709 So. 2d at 521, a claim of newly discovered

evidence is governed by the following two-part test:

> First, in order to be considered newly discovered, the evidence "must
> have been unknown by the trial court, by the party, or by counsel at
> the time of trial, and it must appear that defendant or his counsel could
> not have known [of it] by the use of diligence." *Torres-Arboleda v.
> Dugger*, 636 So. 2d 1321, 1324-25 (Fla. 1994).
> Second, the newly discovered evidence must be of such nature
> that it would probably produce an acquittal on retrial. *Jones*, 591 So.
> 2d . . . 911, 915 [(Fla. 1991)]. To reach this conclusion the trial court
> is required to "consider all newly discovered evidence which would
> be admissible" at trial and then evaluate the "weight of both the newly
> discovered evidence and the evidence which was introduced at the
> trial." *Id.* at 916.

This test applies not only to the guilt phase of a first-degree murder trial, but also

to the penalty phase; when the penalty phase is at issue, the second prong requires

a determination of whether the newly discovered evidence "would probably yield a

less severe sentence" on resentencing. *Swafford v. State*, 125 So. 3d 760, 767 (Fla.

2013).

<u>First Prong of *Jones*</u>

Brown argues that the circuit court erred in denying relief based on its

conclusion that the testimony provided by Swindle, Edmonson, and Henderson

fails the first prong of the *Jones* test. We agree with Brown with respect to the

testimony of Swindle and Edmonson. Lee's confessions to these women could not

have been discovered with due diligence at the time of trial because they did not

yet exist.[14]  Although Brown and her counsel knew that Lee had made a similar

statement to another person, Wendy Moye, and if Lee's confessions are true,

Brown would have known that fact, the defense's knowledge of the substance of

these statements does not disqualify them from being considered newly discovered

evidence.  *See Archer v. State*, 934 So. 2d 1187, 1194 (Fla. 2006) (explaining that a

defendant's knowledge at the time of trial of the facts that would be presented by a

witness as newly discovered evidence does not invalidate a claim of newly

discovered evidence, as the "appropriate question" is whether the defendant "was

or should have been aware of the existence of" the evidence offered to prove those

facts).  They are additional pieces of evidence that have been discovered since trial

and relate to the circumstances that existed at the time of trial and, as such,

constitute newly discovered evidence.  *See id*.  Also, they add information not

contained in Moye's testimony: that the reason Lee participated was that the victim

was sleeping with Lee's husband, that Brown and Miller "didn't do anything," that

Lee was not remorseful and in fact said she would do it again, and that Brown and

Miller were sleeping with her husband.  Therefore, because Lee's confessions to

---

14.  The circuit court ruled that none of this evidence was newly discovered
precisely because it did not exist at the time of trial.  This ruling is rooted in
language we used in *Porter v. State*, 653 So. 2d 374, 380 (Fla. 1995), from which
we have since receded, *Wyatt v. State*, 71 So. 3d 86, 100 (Fla. 2011).

Swindle and Edmonson satisfy the first prong of *Jones*, the circuit court should have analyzed them under the second prong.

The testimony of Nicole Henderson, however, is of a different nature and does not satisfy the first prong of *Jones*. This testimony pertains to distinct criminal acts committed by Lee after trial that do not relate to the circumstances existing at the time of trial and, contrary to Brown's argument, would not satisfy the reverse *Williams* rule. We have previously held that unrelated posttrial events do not qualify as newly discovered evidence. *See Kearse v. State*, 969 So. 2d 976, 987 (Fla. 2007) (affirming the denial of a newly discovered evidence claim where Kearse alleged that an expert's conduct in a subsequent, unrelated case demonstrated that expert's testimony in the Kearse's case was biased); *Porter v. State*, 653 So. 2d 374, 379-80 (Fla. 1995) (holding that Porter's good conduct in prison was not newly discovered evidence), *receded from on other grounds by Wyatt v. State*, 71 So. 3d 86, 99-100, 100 n.13 (Fla. 2011). Notably, contrary to the allegations of Brown's motion, Henderson's testimony does not include statements made by Lee comparing a woman she attacked or threatened in prison to the victim or admitting a larger role in the victim's murder than Lee claimed at trial. Therefore, Henderson's testimony about Lee's conduct in prison is simply evidence of unrelated posttrial events and does not satisfy the first prong of *Jones*.

Accordingly, only the testimony of Swindle and Edmonson is the newly discovered evidence that must be considered under the second prong of *Jones*.

Second Prong of *Jones*

An assessment of the second prong of *Jones* includes consideration of "whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence," "whether the evidence is cumulative to other evidence in the case," and "the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence." *Jones*, 709 So. 2d at 521. When evaluating these factors to determine whether the newly discovered evidence would probably result in an acquittal or a lesser sentence on retrial, *see id.*; *Swafford*, 125 So. 3d at 767, this Court considers it in conjunction with not only the evidence already presented at trial but also any new evidence the movant has developed in postconviction proceedings that could be introduced at a new trial, including evidence that has not been considered on its own because it was the subject of a procedurally barred claim. *See Hildwin v. State*, 141 So. 3d 1178, 1181, 1184 (Fla. 2014). In other words, this Court examines the newly discovered evidence at issue in light of a "total picture" of the case that could be presented at a new trial. *See id.* at 1184.

Brown argues that the testimony of Swindle and Edmonson constitutes valuable impeachment evidence that would probably result in an acquittal of first-

degree murder or a life sentence for Brown. More specifically, Brown contends that Lee's statements to Swindle and Edmonson would impeach Lee because they are inconsistent with her trial testimony and reveal her motive for the murder. We agree with Brown that Swindle's and Edmonson's testimony of Lee's statements regarding her motive for, role in, and feelings about the murder is materially inconsistent with Lee's trial testimony. Specifically, it is inconsistent with Lee's portrayal of herself as an innocent bystander who tried to warn Zimmerman—her "good friend[]" whom she would never harm—of the impending attack as it began and who tried to run away herself but was nevertheless forced to go to the scene of the brutal beating and murder, where she encouraged her friend to run and contemplated escaping herself but was too afraid to make an attempt. Because Swindle's and Edmonson's testimony of Lee's posttrial statements is materially inconsistent with this account, it would be admissible as impeachment evidence under section 90.608(1). *Cf. Izquierdo v. State*, 890 So. 2d 1263, 1265-67 (Fla. 5th DCA 2005) (affirming a trial court's decision to admit testimony as to previous statements of a witness that the defendant had been violent toward her and others where she testified at trial that she had a good relationship with him, that he was "lovable and tender" and "nice," that he had never been controlling, and that she had never been afraid of him); *see also Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004) (explaining that impeachment material under section 90.608(1) does not

- 56 -

have to "directly contradict" the witness's testimony as long as it is "materially different" from it).

In addition, we agree with Brown that the testimony that Brown and Miller were sleeping with Lee's husband would be admissible for impeachment purposes. Specifically, it would be admissible under section 90.608(2) to impeach Lee concerning her motive to place the blame on them. *Cf. Green v. State*, 691 So. 2d 49, 50 (Fla. 4th DCA 1997) (holding that the defendant in a sexual battery case should have been allowed to elicit testimony that the alleged victim, a witness in the case, had asked the defendant's wife if she could think of a way to "get rid of" the defendant so that the victim could move in with the wife); *see also Gibson v. State*, 661 So. 2d 288, 291 (Fla. 1995) ("Our evidence code liberally permits the introduction of evidence to show the bias or motive of a witness [in testifying].")[15]

At a retrial, the testimony of Edmonson and Swindle would combine with the impeachment evidence already presented at trial through the cross-examination of Lee and the testimony of Wendy Moye. Moye's trial testimony revealed statements Lee made in jail that are substantively similar to the statements she later made to Edmonson and Swindle regarding the actions she took in furtherance of

---

15. To the extent Brown is suggesting that the testimony of Swindle and Edmonson could be admitted as substantive evidence of Lee's motive to kill the victim, she has not explained why the testimony would not constitute inadmissible hearsay if offered for that purpose.

the murder. As noted in our analysis of the first prong of the *Jones* test, however, the new evidence would also go further than Moye's testimony. This new evidence would challenge Lee's credibility as to her relationship with the victim and role in the events by providing her stated reason for the dominant role she denied at trial but subsequently claimed; indicate not only that she was dominant but that, in her words, Brown and Miller "didn't do anything"; show her lack of remorse for her participation in the brutal beating, burning, and killing of Zimmerman, contrary to her trial claim that she would not "harm a hair on [Zimmerman's] head"; and suggest an additional reason that she may want to blame Brown and Miller.

The efficacy of the testimony of Swindle and Edmonson would be enhanced by the testimony that could be presented from Darren Lee and Terrance Woods that Lee has made inconsistent statements about her involvement in the murder and indeed stated a couple of days before the murder that she intended to kill the victim for having an affair with her husband—evidence Brown now relies on as substantive proof of Lee's role and motive. Furthermore, Brown would be able to present impeachment evidence similar to that of Swindle and Edmonson from Jabali, including a confession by Lee that she was the "ringleader"; comments by Lee, which Jabali read in Lee's journal, that she forced Brown and Miller, who were scared, "[j]ust to do simple things," and bribed Brown with drugs, along with

a statement that the victim "got what she deserved"; and a threat by Lee to do to other inmates what she had done to her "baby daddy's mistress" if they became involved with Jabali, who was in a relationship with Lee at the time.

We recognize that, although the new evidence presented through Swindle and Edmonson would be somewhat cumulative to the impeachment evidence presented through Moye, *cf. Williamson v. Dugger*, 651 So. 2d 84, 89 (Fla. 1994), it would likely have some effect, given the importance of the issue on which Lee would be impeached and the number and diversity of additional witnesses—not only those who met Lee in prison but also those who knew her before the crime—who could come forward on the matter at a retrial. Thus, at a new trial where Swindle and Edmonson's testimony was presented, Lee would have even less credibility than she had at Brown's original trial, and it would be more difficult for the State to rely on the position it took at trial that Brown was the one with motive and the one who poured gasoline on the victim and lit her on fire, while Lee's involvement was comparatively minimal.

Nevertheless, the newly discovered evidence must be considered in light of the other evidence presented at trial and available for any retrial bearing on Brown's involvement and culpability in the victim's murder.

When the victim first emerged from scene of the burning, she named two people as the perpetrators—Tina Brown and "Heather"—and said that they

dragged her out of the house, "tased" her, beat her in the head with a crowbar, and then set her on fire. She repeated those two names several times and told where those individuals lived. Similarly, the victim told a paramedic that "Tina, Heather, and Britnee" poured gasoline on her and set her on fire. The victim did not distinguish among the perpetrators in terms of who did what, which suggests that in her experience, they were all acting in concert.

M.A., on the other hand, testified that from her observations at the trailer, Brown was the primary aggressor, although Lee also participated by putting a sock in the victim's mouth. Brown is the one whose trailer and vehicle were used in the crime, and she is the one M.A. heard screaming at the victim about calling Crime Stoppers. She is the one who, according to M.A., operated the stun gun, held the victim's hands behind her back, and forced the victim into the trunk. Consistent with M.A.'s testimony, Brown's DNA was on the stun gun.

In addition to M.A.'s testimony and the forensic evidence, there were incriminating statements by Brown and her daughter. Just before the crime started, Brown's daughter, Miller, told M.A. that they were going to kill the victim. And Pamela Valley testified, albeit not without impeachment, that, days after the crime was complete, Brown wanted the victim "finish[ed] off." Further, in any retrial, Brown's new jury would hear compelling evidence against her that her original jury did not: Brown admitted at the *Spencer* hearing that she "was one of the ones

- 60 -

who participated in taking [Zimmerman's] life" and commented that "[Zimmerman] didn't deserve it at all."

In consideration of the foregoing evidence that is independent of Lee's testimony, when considered cumulatively with all of the evidence that would be admissible in a new trial, the newly discovered evidence from Edmonson and Swindle fails the second *Jones* prong as to the guilt phase, as the evidence is not of such a nature that it would probably produce an acquittal on retrial. In fact, the impeachment of Lee would do little, if anything, to disturb the evidence of felony murder. While Swindle did testify that Lee said that the other two codefendants "didn't do anything," significant evidence belies that claim.

The newly discovered evidence fails the second *Jones* prong as to the sentencing question as well. In reaching this conclusion, we recognize that the testimony of Swindle and Edmonson, along with corroborating evidence, would impeach Lee on a major point the State relied on in support of the death penalty: that Brown was the "main aggressor" and the one who lit the fire. Indeed, the trial court relied on this point in its sentencing order, concluding in its discussion of the HAC aggravator that, "[o]f all [Brown's] flagitious acts, . . . the cruelest were her actions in dousing Audreanna Zimmerman with gasoline and setting her on fire." The trial court also reiterated this point in its discussion of whether Brown was a minor participant in the crime, stating, "The evidence introduced at trial proves

[Brown] was the *leader* of the efforts to murder Audreanna Zimmerman. It is clear [Brown] poured gasoline on Zimmerman and set [her] on fire." Notably, Lee's testimony was the only evidence that unambiguously singled out Brown as the person who lit the victim on fire, but not the only evidence that she was a, if not the, primary aggressor, at least at the trailer.

Considering the attention given to the facts that Brown was the one who lit the victim on fire and was the main aggressor—both as points supporting the death penalty and as an explanation for the different treatment of Lee—we believe the additional impeachment of Lee *might* result in a lesser sentence at a retrial. However, it cannot be said that it *would probably* result in a lesser sentence. In delivering that additional impeachment testimony, Swindle and Edmonson would also testify that Lee seemed to be trying to act tough, as would Jabali in delivering her corroborating impeachment testimony concerning Lee's verbal statements to her. At the same time, Lee's posttrial claim that Brown and Miller "didn't do anything" would be obliterated by the forensic evidence, the victim's dying declaration, and the eyewitness testimony of M.A. concerning Brown's role in the events at her trailer. Although there would be a more substantial question as to whether Brown actually lit the fire and acted as the primary aggressor, especially once the testimony of Darren Lee and Terrance Woods was added, all the evidence that the murder itself was heinous, atrocious, or cruel—a weighty aggravating

factor—would still stand, and the new evidence would not carry any significant probability of showing Brown to have been a minor participant. The subjective assessment of the jurors, and perhaps the trial court, as to whether Brown should receive a death sentence might change, but the possibility that it would change does not meet the standard required for a new trial, which is a showing that it would probably change. *See Swafford*, 125 So. 3d at 767.

Accordingly, we affirm the circuit court's denial of relief.

### C. *Hurst*

In the final issue raised on appeal, Brown argues that the circuit court erred in summarily denying her claim that she is entitled to relief from her death sentence under *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016). After the circuit court denied relief, we "recede[d] from *Hurst v. State* except to the extent it requires a jury unanimously to find the existence of a statutory aggravating circumstance beyond a reasonable doubt." *State v. Poole*, 45 Fla. L. Weekly S41, S48 (Fla. Jan. 23, 2020), *clarified,* 45 Fla. L. Weekly S121 (Fla. Apr. 2, 2020). Although the required jury finding does not exist in Brown's case, we agree with the circuit court that the error is harmless beyond a reasonable doubt.[16]

_____

16. In *Mosley v. State*, 209 So. 3d 1248, 1283 (Fla. 2016), we held that *Hurst v. Florida* and *Hurst v. State* retroactively apply to sentences of death that became final after the United States Supreme Court decided *Ring v. Arizona*, 536

At trial, the State argued that Brown was guilty of first-degree murder under both premeditated and felony murder theories and presented uncontroverted evidence that the capital felony was committed while Brown was engaged, or was an accomplice, in the commission of a kidnapping. Any jury that found, based on the State's presentation, that Brown was guilty of first-degree murder could not have logically concluded that Brown was not also guilty of kidnapping, whether as the primary aggressor or an accomplice. Accordingly, we hold that, under the circumstances of this case, there is no reasonable doubt that a "rational jury," properly instructed, would have found beyond a reasonable doubt the existence of the statutory aggravating circumstance that the capital murder was committed while Brown was engaged in the commission of a kidnapping. *Galindez v. State*, 955 So. 2d 517, 522 (Fla. 2007) (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)); *see also State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986). Because the existence of a single statutory aggravating circumstance would render Brown eligible for imposition of the death penalty, *see Poole*, 45 Fla. L. Weekly at 545-46, it is unnecessary to address any of the other statutory aggravators found by the

---

U.S. 584 (2002). In a footnote in its answer brief, the State takes issue with *Mosley*, which applies to Brown because her sentence of death became final after *Ring*. However, we decline to revisit precedent based on assertions in a footnote. *Cf. Simkins Indus., Inc. v. Lexington Ins. Co.*, 714 So. 2d 1092, 1093 (Fla. 3d DCA 1998) (explaining that referencing a matter in a footnote "does not elevate the matter to a point on appeal").

trial court to conclude that the sentencing error in Brown's case is harmless. Accordingly, we affirm the circuit court's denial.

## III. HABEAS PETITION

In her habeas petition, Brown argues that appellate counsel was ineffective on direct appeal for failing to raise claims of fundamental error based on several statements made by the prosecutor during the State's rebuttal closing argument at trial that Brown now contends amount to prosecutorial misconduct. Because we disagree with Brown that these statements individually or cumulatively amount to fundamental error, we deny her habeas petition.

In general, claims of ineffective assistance of appellate counsel are properly presented in a petition for writ of habeas corpus, *Baker v. State*, 214 So. 3d 530, 536 (Fla. 2017); *Wickham v. State*, 124 So. 3d 841, 863 (Fla. 2013), and this Court has explained the applicable standard of review as follows:

> "The standard of review for ineffective appellate counsel claims mirrors the *Strickland* standard for ineffective assistance of trial counsel." [*Wickham*, 124 So. 3d at 863]. Specifically, to be entitled to habeas relief on the basis of ineffective assistance of appellate counsel, the defendant must establish
>
> > [first, that] the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, [that] the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

> *Bradley v. State*, 33 So. 3d 664, 684 (Fla. 2010) (quoting *Pope v.*
> *Wainwright*, 496 So. 2d 798, 800 (Fla. 1986)).

*England v. State*, 151 So. 3d 1132, 1140 (Fla. 2014). Further, appellate counsel is

not ineffective for failing to raise meritless claims or issues on appeal that were not

properly raised in the trial court and are not fundamental error. *Valle v. Moore*,

837 So. 2d 905, 907-08 (Fla. 2002).

An error is considered fundamental if it "reaches down into the validity of

the trial itself to the extent that a verdict of guilty could not have been obtained

without the assistance of the alleged error." *Boyd v. State*, 200 So. 3d 685, 708

(Fla. 2015) (plurality opinion) (quoting *Rodriguez v. State*, 919 So. 2d 1252, 1282

(Fla. 2005)); *see Doty v. State*, 170 So. 3d 731, 743 (Fla. 2015) (explaining that the

standard for fundamental error with respect to the sentence is "one that 'reaches

down into the validity of the trial itself' and that a sentence of death 'could not

have been obtained without the assistance of the alleged error' " (quoting

*Snelgrove v. State*, 107 So. 3d 242, 257 (Fla. 2012))); *see also Chandler v. State*,

702 So. 2d 186, 191 n.5 (Fla. 1997) (describing fundamental error as error that is

"so prejudicial as to vitiate the entire trial").

Brown's habeas petition references two statements by the prosecutor that

were arguably improper. First, the prosecutor likely crossed the line in referring to

Brown, once, as a "cold-blooded murderer." *See Morris v. State*, 233 So. 3d 438,

447, 449 (Fla. 2018) (holding that the prosecutor's statements referring to the

defendant as "cold-blooded," "stone cold," and "ruthless" may have crossed the line).  However, this statement was a single occurrence, and we have declined to find fundamental error based on comparable statements.  *See id.*; *see also Davis v. State*, 928 So. 2d 1089, 1127 (Fla. 2005) (holding prosecutor's references to the defendant as "a cagey little murderer" and a "[l]ittle robber, cagey little thief" did not constitute fundamental error).

Second, and presenting a closer call as to whether the statement is even improper, is the prosecutor's rhetorical question asking how Doyle, who was the State's witness, would have learned information about the victim's murder apart from gaining it from Brown.  On the one hand, this argument could be viewed as improper because the jury did not know Doyle had stated in a pretrial deposition— at which the prosecutor was present—that she had heard on the news that "there was a girl that was lit on fire and that she was taken by helicopter and that before she died she said the . . . names [of her killers]."  *See Craig v. State*, 685 So. 2d 1224, 1229-30 (Fla. 1996) (recognizing that prosecutors have a duty not to present false or misleading arguments to the judge or jury); *Thompson v. State*, 273 So. 3d 1069, 1077 (Fla. 1st DCA 2019) ("Improper prosecutorial 'vouching' for the credibility of a witness occurs where a prosecutor suggests that she has reasons to believe a witness that were not presented to the jury, or, stated differently, where the prosecutor implicitly refers to information outside the record." (quoting

*Jackson v. State*, 89 So. 3d 1011, 1018 (Fla. 4th DCA 2012))).  On the other hand, this argument could be viewed as properly directed at the *specific* information about the murder Doyle testified at trial to having learned from Brown, including the names of the individuals involved and details of the crime, such as that the victim was beaten and attacked with a stun gun.  Regardless, the record establishes that Doyle's testimony contained details of the victim's murder that were not among the general information that Doyle attributed to the news report during her deposition.  Specifically, Doyle testified in her pretrial deposition that all she heard on the news was that a "girl" was lit on fire and that before she died she said "the girls' names," noting that the news report did not release the names.  At trial, Doyle testified that Brown told her about details of the victim's murder, namely that Brown and her daughter beat the victim with a tire iron, "tazed" the victim, and caught the victim on fire, and that Miller accidentally set herself on fire during the crime.  Although there is no indication in the record that Miller caught herself on fire during the crime, the other details Doyle testified to regarding the victim's murder indicate that Doyle learned of the details of the murder from Brown and not the news.  Accordingly, even if improper, the prosecutor's statement was not so prejudicial as to vitiate the entire trial.  *See Chandler*, 702 So. 2d at 191 n.5.

Moreover, even assuming that both of the prosecutor's statements were improper, when "viewed cumulatively in light of the record in this case," they do

not "reach[] the critical mass of fundamental error" that is so prejudicial as to vitiate the entire trial. *Brooks v.* State, 762 So. 2d 879, 899 (Fla. 2000) (quoting *Cochran v. State*, 711 So. 2d 1159, 1163 (Fla. 4th DCA 1998)); *Chandler*, 702 So. 2d at 191 n.5.

Accordingly, because appellate counsel was not ineffective for failing to challenge on direct appeal unpreserved issues that do not amount to fundamental error, *see Valle*, 837 So. 2d at 908, we deny Brown's habeas petition.[17]

---

17. The other statements that Brown references in her habeas petition were not improper and therefore could not have supported a claim of fundamental error. Specifically, first, the prosecutor's statement that Brown "baited" the victim "into the lion's den by telling her things were okay" does not cross the line into an improper inflammatory argument on the facts of this case. Rather, the prosecutor asked the jury to make a permissible inference based on the evidence that Brown "lured [the victim] into her home under false pretenses." *Brown*, 143 So. 3d at 407. Second, the prosecutor did not improperly belittle defense counsel by disparaging his argument that Brown was not guilty of first-degree murder. Rather, the prosecutor permissibly explained why defense counsel's arguments seeking a conviction of second-degree murder were not supported by the evidence adduced at trial. Third, the prosecutor did not improperly vouch for the credibility of State witnesses Valley and Doyle by asking what motive Valley had to make up her testimony and what Doyle had to gain by testifying. Rather, the prosecutor's arguments were proper responses to defense counsel's credibility attacks on these witnesses in light of the evidence presented at trial. Finally, the prosecutor did not improperly demand justice for the victim or the victim's family. Rather, the prosecutor's reference to "justice" is fairly read as a response to defense counsel's explanation of the jury's role, and it was made in the context of addressing the verdict that is required when the State meets its burden to prove guilt beyond a reasonable doubt.

# IV. CONCLUSION

For the foregoing reasons, we affirm the circuit court's order denying postconviction relief and deny Brown's habeas petition.

It is so ordered.

POLSTON, LAWSON, MUÑIZ, and COURIEL, JJ., concur.
CANADY, C.J., concurs in result with an opinion.
LABARGA, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., concurring in result.

I agree with the per curiam opinion except for the analysis of the *Hurst* issue. Although I agree that the *Hurst* error here is harmless, I also adhere to the view that "[t]he new rule articulated in *Hurst v. Florida*—which simply requires that the jury find an aggravator—is an evolutionary refinement in the law that does not cast doubt on the veracity or integrity of penalty phase proceedings resulting in death sentences that are now final" and that the new rule therefore should not be given retroactive effect. *Mosley v. State*, 209 So. 3d 1248, 1291 (Fla. 2016) (Canady, J., concurring in part and dissenting in part).

*Poole*—which corrected this Court's misinterpretation of *Hurst v. Florida*—dismantled the foundation for the majority's analysis in *Mosley*. After *Poole*, *Mosley* is the ghost of a precedent. The retroactivity issue presented by this case therefore should be determined in light of *Poole*. And *Poole* makes clear that

- 70 -

*Hurst v. Florida* was an evolutionary refinement in the law that should not be applied retroactively.

An Appeal from the Circuit Court in and for Escambia County,
    Gary L. Bergosh, Judge - Case No. 172010CF001608XXXAXX
And an Original Proceeding – Habeas Corpus

Robert Friedman, Capital Collateral Regional Counsel, Dawn B. Macready and Stacy R. Biggart, Assistant Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida,

     for Appellant/Petitioner

Ashley Moody, Attorney General, and Michael T. Kennett, Assistant Attorney General, Tallahassee, Florida,

     for Appellee/Respondent